UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **Linda Guzzo,** | : | |
| **Plaintiff** | : | 3:21CV0254(CSH) |
| v. | : | |
| **Connecticut State Colleges and Universities, State of Connecticut** | : | July 7, 2022 |
| **Defendant, and** | : | |
| **Rob Steinmetz, Diane Bordonaro, and G. Duncan Harris,** | : | |
| **Defendants in their official capacities:** | : | |

**SECOND AMENDED COMPLAINT**

I.   **INTRODUCTION**

1.   The plaintiff, Linda Guzzo, brings this action against her employer, the defendant, Connecticut State Colleges and Universities (CSCU), an agency of the State of Connecticut, and against the individually named defendants, Rob Steinmetz, Diane Bordonaro, and G. Duncan Harris, in their official capacities only. The plaintiff alleges that she was denied reasonable accommodations and discriminated against due to her disabilities in violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq., as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §12101 et seq. ("ADAAA"). The plaintiff also alleges discrimination and/or retaliation in employment because the plaintiff exercised rights under the Family and Medical Leave Act, 29 U.S.C. §2615(a)(2) and §2615(b).

2. The plaintiff seeks to be made whole, including injunctive relief in the form of reinstatement and promotion to a position in defendant's employ that she would have received but for the defendant's discriminatory and/or retaliatory conduct; an award of any and all lost wages and benefits of employment pursuant to the Rehabilitiation Act of 1973; ; compensatory damages pursuant to the Rehabilitation Act of 1973; and her reasonable attorney's fees and costs.

## II. JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. §1331.

4. Venue is appropriate in the District of Connecticut pursuant to 28 U.S.C. §1391(b), because a substantial part of the events giving rise to his claim occurred within this judicial district.

## III. PARTIES

5. The plaintiff, Linda Guzzo, is a person residing at 26 Paxton Road, West Hartford Connecticut.

6. The plaintiff suffers from an anxiety disorder that substantially limits her ability to concentrate, sleep, and work as compared to most people in the general population.

7. The plaintiff suffers from a chronic digestive disorder that substantially limits the plaintiff in the functioning of her digestive system as compared to most people in the general population.

8. The plaintiff suffers from situation hypertension that substantially limits her ability to concentrate, sleep, and work as compared to most people in the general population.

2

9. The plaintiff suffers from a chronic impairment due to an injury to her right foot that substantially limits her ability to walk and climb stairs as compared to most people in the general population.

10. The plaintiff suffers from vitiligo, a disfiguring condition.

11. Plaintiff has and has had a "regarded as disability" as defined in the ADAAA at 42 U.S.C. §§12102(1) and (3) and incorporated into the Rehabilitation Act, in that she has an actual or perceived emotional impairment and ab actual or perceived physical impairment.

12. Plaintiff is and at all relevant times has been an "individual with a disability" within the meaning of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 705(9) (B) and (20)(B), which incorporates by reference the standards of the Americans with Disabilities Act, as amended in 2008 ("ADAAA"). The disabilities described in paragraphs 6 through 10, above, constitute "serious medical conditions" for purposes of the Family and Medical Leave Act, 29 U.S.C. §2601, *et seq.*

13. Defendant Connecticut State Colleges and Universities (CSCU) isan agency of the State of Connecticut, with a principal place of business at 61 Woodland Street, Hartford, Connecticut. CSCU is a program or activity receiving Federal financial assistance within the meaning of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et seq., as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §12101 et seq. ("ADAAA").

14. Defendant Rob Steinmetz is, at all times relevant to this litigation, employed by defendant CSCU as Community College Regional President (Capitol-East). He is named in his official capacity only.

15. Defendant Diane Bordonaro is, at all times relevant to this litigation, employed by defendant CSCU as a Chief Regional Workforce Development Officer. Bordonaro reports to Steinmetz. She is named in her official capacity only.

16. Defendant G. Duncan Harris is, at all times relevant to this litigation, employed by defendant CSCU as Interim Chief Executive Officer for Capital Community College and subsequently Chief Executive Officer for Capital Community College. Harris also reports to Steinmetz. He is named in his official capacity only.

17. The plaintiff has been employed by the defendant from in or about 1984 to the present.

18. At all relevant times plaintiff has been and is able to perform the essential functions of her position as Dean of Workforce Development, Continuing Education, Career Services, and Community Outreach with the defendant CSCU, with or without reasonable accommodation.

## IV. FACTS

19. Over the course of the plaintiff's employment by the defendant, she has held the positions of Director of Continuing Education Business Programs; Coordinator, Business & Industry Services; Director of Business & Industry Services; Interim Associate Dean of Continuing Education; Associate Dean of Continuing Education; and – most recently – Dean of Workforce Development, Continuing Education, Career Services, and Community Outreach.

20. Throughout the plaintiff's employment by the defendant, she has consistently performed the duties of her position at or above the reasonable expectations of her

4

supervisors, including for a time performing the duties of two long term vacant director positions in addition to her position as Dean, with no additional compensation.

21. Beginning in or about 2018, the plaintiff reported to Duncan Harris, Interim Campus Chief Executive Officer for Capital Community College and subsequently Campus Chief Executive Officer for Capital Community College, as part of his "Cabinet" of direct reports.

22. Defendant CSCU has a history of placing individuals into "interim" positions in order to delay conducting searches. The delay provides temporary promotional opportunities, increased compensation, and advantages to incumbents when searches are conducted to permanently fill positions.

23. In or about May and June 2018, the plaintiff was passed over for appointment to the position of Interim Academic Dean of Capital Community College.

24. Defendant Harris told the plaintiff that if she applied for the position, she would not be considered because she was "near retirement."

25. Plaintiff has limitations to her mobility because of a workplace injury, described above in paragraph 9. Beginning in or about May 2019, on several occasions where Harris and his "Cabinet" attended off-campus events, plaintiff's physical limitations were not considered. Plaintiff had to draw attention to herself by using an elevator rather than stairs, had difficulty walking the long distances to the locations, and using high rise collaborative seating as required by Harris as part of "team building".

26. In or about May and June 2019, plaintiff was passed over for the permanent appointment to Academic and Student Services Dean for Capital Community College. Harris

5

told the plaintiff that if she applied for the position, she would not be considered because she was "near retirement."

27. In or about July 2019, during a meeting of Duncan Harris with his immediate reports, he praised the younger members of the Cabinet with comments such as "Miah you will become a president. Jason you will earn your doctorate. Josephine you will teach."

28. Harris' comment about the plaintiff was that she would be walking out with a walker, and he proceeded to physically mimic the plaintiff walking out the door with a walker.

29. Beginning in or about September 2019, while plaintiff was on an approved FMLA leave of absence, in a meeting with plaintiff's staff, Harris announced his intention to intercept all of plaintiff's email, mail, and calls.

30. During the plaintiff's FMLA leave of absence, Harris did intercept all of plaintiff's email, mail, and calls, and obtained access to her medical certification that had been provided in support of her FMLA leave. After plaintiff's return to work, she requested that the intercepted materials be forwarded to her but Harris did not do so.

31. Beginning in or about September 2019, while plaintiff was on an approved FMLA leave of absence, Harris abruptly and without any legitimate purpose moved plaintiff's office to a less secure location that was more remote from her colleagues and cut off plaintiff's communications with the Cabinet, campus staff and faculty, plaintiff's own staff, and external partners. Due to the plaintiff's mobility impairment, the change was intended to and did interfere with the plaintiff's ability to navigate the campus and perform the duties of her job.

32. Beginning in or about September 2019, while plaintiff was on an approved FMLA leave of absence, Harris falsely informed external partners that they were not to communicate with plaintiff because she was retiring and/or otherwise not returning to work.

6

33. Harris also removed plaintiff from the Cabinet group texts which was the standard form of communication among his management team.

34. Due to Harris's actions, while on FMLA the plaintiff received no communications from the Cabinet even for informational purposes.

35. When the plaintiff returned to work, she discovered that her office had been relocated and all of her files and personal belongings had been removed. Both Human Resources and Campus Security stated they were unaware of whether or where the plaintiff had been assigned to work or why the move had occurred.

36. Ultimately, plaintiff was assigned to an office she had previously occupied. The office was not ready for occupancy such that furniture had to be rearranged in order for the space to be usable, there was no working computer in the office, no heat and no security measures for the main door of the office, which was not visible by the plaintiff from her workspace.

37. Harris told plaintiff that some of her missing files might be located in an unused work area known as "the kitchen," and instructed her to clean out the work area. Harris also instructed the plaintiff to clean out the office of another employee who retired while the plaintiff was on FMLA. Cleaning offices and searching for missing files are not part of the plaintiff's regular job duties; Harris instructed the plaintiff to perform these tasks in retaliation for her exercise of rights under the Family and Medical Leave time and/or to discriminate against the plaintiff on account of her disabilities.

38. Most of plaintiff's files and all of her personal belongings that had been removed from her office while she was on FMLA leave were never located or returned.

7

39. After the plaintiff returned from her FMLA leave of absence, Harris took away the plaintiff's reserved parking space, making her the only member of management not to have a reserved parking space. Thereafter, the plaintiff frequently had to park in areas further from her office and/or less secure which, due to her mobility disability, made her navigation of campus more difficult.

40. In 2020, Connecticut State Colleges & Universities accepted applications for three vacant positions for Chief Workforce Development Officer, including a position for the Capital-East Region, which includes Capital Community College.

41. Harris interfered with the normal chain of communications that would have alerted plaintiff to the vacant positions, in order to prevent her from applying.

42. Nonetheless, plaintiff learned of the vacant positions and applied.

43. Although the plaintiff was the most experienced and qualified for the position, defendant Steinmetz did not select the plaintiff for any of the vacant positions.

44. Plaintiff was the only Dean of Workforce Development and Continuing Education not selected for one of the executive level vacant positions. Diane Bordonaro, who held the position of Director of Continuing Education (a subordinate position to the plaintiff's with no experience in the role of Dean) was selected for the other vacant position as Chief Workforce Development Officer.

45. Harris was a required reference for the Chief Workforce Development Officer position. None of plaintiff's other references were contacted, which included former presidents and executives. The decision to deny the plaintiff her promotion was based on Harris's hostile comments about the plaintiff and the animosity of Steinmetz.

8

46. As a result of Bordonaro's promotion, she became the plaintiff's "direct line" manager while Harris remained as her "dotted line" manager.

47. Plaintiff also applied for the position of Associate Vice President of Student Success Management. Although the plaintiff was qualified, defendants Steinmetz and Harris interfered with the selection process and she was not given the position.

48. Beginning in or about August 2020, Bordonaro and Harris took actions to remove responsibilities from plaintiff's position, diminish her position, and took actions intended to humiliate plaintiff. These actions and other actions described below were intended to punish the plaintiff for exercising rights under the Family and Medical Leave Act and/or to discriminate against her on account of her disabilities, with the goal of forcing the plaintiff to retire.

49. Bordonaro and Harris transferred responsibility for the Financial Literacy (FIRST) Center, Career Services, and Extension Fund Programs – initiatives that plaintiff had created and successfully led – to other, less-qualified employees. In at least one instance, a less qualified employee who had reported to the plaintiff was assigned to take over some of the plaintiff's duties in order to humiliate the plaintiff.

50. Bordonaro and Harris modified contracts for plaintiff' staff without consulting her and excluded her from communications with her staff; they also permitted other staff to give directives to plaintiff's staff.

51. Bordonaro and Harris ignored plaintiff's requests to serve on committees and projects and participate in professional development opportunities and falsely represented the plaintiff's performance in her annual performance review..

9

52. Bordonaro and Harris refused to provide plaintiff with requested documents that had been provided to other employees.

53. Bordonaro and Harris actively discouraged other employees and external partners from communicating with plaintiff or seeking her assistance and excluded her from meetings with organizations and individuals with whom the plaintiff had previously worked for years

54. Bordonaro and Harris informed plaintiff that other existing areas of responsibility in her position would be transferred to other employees.

55. Harris removed plaintiff's responsibility for managing recently awarded grants that had been written and obtained by the plaintiff and assigned them to other staff members.

56. Bordonaro, as Chief Workforce Development Officer for Capital-East Region, scheduled the first meeting to discuss the regional plan for the operation of workforce development and continuing education – a meeting for which plaintiff would ordinarily have been expected to be present – for a date two days before the end of plaintiff's vacation. The selection of the date was made by Bordonaro and not based on the polling of attendees.

57. Bordonaro refused plaintiff's request to reschedule the meeting, even though it meant not only that plaintiff would not be present, but that she would not be able to prepare her own staff for the meeting.

58. Bordonaro also refused plaintiff's request to record the meeting and provide notes so that she could be aware of what transpired, even though she could not be present.

59. Bordonaro scheduled multiple meetings with the plaintiff's staff without informing and updating the plaintiff.

60. Bordonaro took actions to remove responsibilities from plaintiff's position, diminish her position, and took actions intended to humiliate plaintiff, including assigning projects directly to plaintiff's staff, giving her staff directions, excluding plaintiff from meetings, asking in meetings if plaintiff knew how to perform tasks that she had been doing for more than thirty years, and informing external partners not to communicate with plaintiff.

61. Bordonaro and Harris refused to adjust plaintiff's vacation time so she could respond to time sensitive and highly visible programs, that resulted in her working multiple days while on vacation. Although the plaintiff made multiple requests to have vacation time returned for days on which she worked, her requests were ignored or refused.

62. Defendant has repeatedly ignored plaintiff's safety concerns and has not followed required safety agreements.

63. In or about October 2020, defendant rescinded plaintiff's annual salary increase.

64. In or about August 2021, and although Harris was well aware of the plaintiff's ongoing medical issues, he informed the plaintiff that the defendants intended to open a Covid-19 testing site adjacent to her office.

65. The plaintiff complained to Harris that there were numerous other locations in the college where the testing center could have been placed, and that by locating it in the vicinity of her office, she was being exposed to serious and possibly deadly conditions.

66. Harris did not respond to the plaintiff's complaint or take any action to re-locate the testing center, except on one occasion sarcastically advising the plaintiff to "mask up."

67. Beginning at that time and continuing until her involuntary retirement in 2022, the plaintiff made repeated complaints to the defendants regarding the placement and

11

operation of the Covid-19 testing center and the potential hazard that its presence posed to her because of her disability.

68. Despite the plaintiff's best efforts and the obvious risks to her health and well-being, the plaintiff was unable to convince Harris, Bordonaro, or anyone else employed by the defendant CSCU to relocate the Covid-19 testing center.

69. Defendants' refusal to relocate the Covid-19 testing center put the plaintiff at considerable and completely unnecessary risk to her health and caused her severe emotional distress. Students and staff who came to the floor seeking Covid-19 testing frequently came to or into the plaintiff's office either believing her office was the testing site or asking for directions. Staff from the Covid-19 testing center inappropriately disposed of medical waste and failed to follow protocols that would have made the area more safe. Public safety staff who were alerted to the inappropriate disposal failed to take action and/or made false statements to avoid taking action.

70. Around this time the plaintiff also expressed concern about the possibility of being required to return to work full time on the campus. The plaintiff communicated to Human Resources that her doctor had requested that as a reasonable accommodation for her disabilities, she should be allowed to work from home most of the week.

71. Instead of addressing the plaintiff's request for a reasonable accommodation, Human Resources informed the plaintiff that it would be "better" if she requested to be allowed to work from home under the defendant CSCU's teleconference policy.

72. When the plaintiff then made the request to be allowed to work from home under the teleconference policy, defendant Bordonaro immediately informed her that she would need to "justify" her need to work from home. This was distressing to the plaintiff

12

because she had requested a reasonable accommodation so that she would not have to disclose information about her medical condition to Bordonaro.

73. Although the plaintiff continued to express her concern to Human Resources that she should be considered for a reasonable accommodation to her disability and that she was disturbed by Bordonaro's efforts to obtain information about the plaintiff's medical condition, they continued to tell her that she should request to work from home under the teleconference policy.

74. In January 2022, the plaintiff complained in an email to Bordonaro and Harris about her exclusion from a meeting with Hartford Adult Education and Capital Workforce Partners, long-time working partners with the plaintiff. The plaintiff copied the email to Diane Mazza, defendant's Human Resources Shared Services Director of HR Strategy and subsequently requested a meeting with Mazza to re-state her complaint about being excluded from meetings and having responsibilities taken away.

75. Finally, in February 2022, the plaintiff participated in a teleconference with Nicholas D'Agostino, Director of Equal Employment Opportunity for the defendant CSCU. In that meeting the plaintiff complained, *inter alia*, about the proximity of the Covid-19 testing center. In doing so, the plaintiff explicitly stated and emphasized to D'Agostino that there were numerous other potentially suitable locations for the Covid-19 testing center. The plaintiff also explicitly stated and emphasized to D'Agostino that she had previously had the experience of having her office suddenly and inexplicably relocated while she was on Family and Medical Leave, that this had been extremely distressing to her, and that she wanted to participate in any decision-making that might be made around the issue of the re-location. D'Agostino acknowledged the plaintiff's concerns.

76. In the meeting, the plaintiff also complained about several compensation issues, including regarding recovery of vacation days on which she had had to work and hours/days not applied to accrued time, and pointed out that in spite of numerous requests and complaints no action had been taken on those issues.

77. A few days after the meeting with D'Agostino, the plaintiff received an email indicating that, contrary to her express repeated and clear requests, D'Agostino had made the unilateral decision to relocate her office – rather than the testing center – and to do so without consulting her. D'Agostino's re-location of the plaintiff's office would have put her on a separate floor from her staff and would have made the performance of her duties more difficult and inconvenient and cause further humiliation.

78. D'Agostino's decision to proceed in this fashion without regard to the explicit and emphatic requests from the plaintiff caused her to suffer extreme emotional distress that worsened her medical conditions.

79. Upon information and belief, while D'Agostino promptly took action that the plaintiff had specifically requested not be taken, he took no action on the compensation issues she had raised and was told by Diane Mazza to re-document the issues she had previously submitted multiple times to HR or her concerns about needing a reasonable accommodation in order to work from home.

80. On or about February 24, 2022, feeling that she had exhausted any possibility of being able to perform the duties of her job without having to cope with defendant CSCU's callous disregard for her physical and emotional health, the plaintiff stated to D'Agostino in an email her intent to retire.

14

81. Plaintiff received no further communications from D'Agostino or her supervisors Harris and Bordonaro regarding her office. The plaintiff arrived to work on February 28, 2022 to find her business equipment and files, and personal belongings again removed from her original office without her knowledge and agreement.. The plaintiff reported the incident to Public Safety in the absence of the human resources campus representative. The incident caused extreme emotional distress that worsened her medical conditions. The missing items were not returned.

82. The plaintiff's retirement was compelled by the plaintiff's deteriorating physical and mental health, which in turn was caused by defendants' repeated efforts to displace her from her job, remove her duties, ignore her requests that she not be exposed to students and staff coming into the vicinity of her office to be tested for Covid-19, ignore her requests to be provided reasonable accommodations, ignore her requests that decisions being made about the location of her office be made in consultation with her, and ignore her requests that action be taken with respect to her compensation.

83. As a result of the plaintiff's compelled retirement in advance of her planned date of retirement, she has suffered a loss of the wage and benefits of her employment, including but not limited to adverse impacts on her pension benefits.

84. As a result of the defendants' discriminatory and retaliatory treatment of the plaintiff, and/or because of the defendant's rejection of the plaintiff's request for reasonable accommodations for her disabilities, the plaintiff suffered and continues to suffer extreme emotional distress, which has significantly worsened her medical conditions.

## V. Count One: Discrimination or Retaliation for Exercise of Rights (FMLA)

1. The plaintiff restates, re-alleges, and incorporates by reference paragraphs 1 through 84, above.

85. The adverse treatment of the plaintiff by defendants Steinmetz, Bordonaro, and Harris, acting in their official capacities, as described above, was motivated by discrimination and/or retaliation for the plaintiff's exercise of rights under the federal Family and Medical Leave Act, §29 U.S.C. §2615(a)(2) and §2615(b).

86. The conduct of the individual defendants in discriminating against and/or retaliating against the plaintiff was done with the intent to coerce the plaintiff into leaving her employment and ultimately succeeded in that effort.

87. The plaintiff seeks injunctive relief to remedy the discrimination and/or retaliation she suffered, including an order of the Court to reinstate the plaintiff to employment, to assign her to a position consistent with that which she would have obtained absent discriminatory and/or retaliatory conduct, and to cease any further discrimination and/or retaliation against the plaintiff.

## VI. Count Two: Denial of Reasonable Accommodations for the Plaintiff's Disabilities

1. The plaintiff restates, re-alleges, and incorporates by reference paragraphs 1 through 84, above.

85. As described above, the plaintiff requested reasonable accommodations for her disabilities, including that the Covid-19 testing center be relocated away from her office, that she be permitted to work from home, and that changes to her office location not be made without consultation, which accommodations posed no undue burden for the defendant CSCU.

86. The defendant denied the plaintiff's requests for reasonable accommodations in violation of the Rehabilitation Act of 1973, 29 U.S.C. 701, *et seq.*

VII. **Count Three: Discrimination Against the Plaintiff Due to Her Disabilities**

1. The plaintiff restates, re-alleges, and incorporates by reference paragraphs 1 through 84, above.

85. Defendant CSCU's adverse actions toward the plaintiff, as described above, were motivated by discriminatory animus directed at the plaintiff because of her disabilities, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §12101 *et seq.* ("ADAAA").

## PETITION FOR RELIEF

WHEREFORE, plaintiff respectfully requests that the Court order the following relief:

1. Make the plaintiff whole, including by reinstating plaintiff to employment and assigning her to a position in defendant's employ to which she would have been promoted but for defendant's wrongful discrimination and/or retaliation;

2. Award plaintiff her economic losses, including lost wages and benefits of employment, including damage to her pension attributable to the defendant's discrimination on account of her disabilities;

3. Award the plaintiff her compensatory damages attributable to the defendant's discrimination on account of her disabilities.

4. Award the plaintiff her reasonable attorney's fees and costs; and

5. Prescribe such other relief as the Court deems appropriate.

## REQUEST FOR A JURY TRIAL

The plaintiff respectfully requests a jury trial as to all of her claims to the extent that she is entitled by law.

RESPECTFULLY SUBMITTED
LINDA GUZZO,
THE PLAINTIFF, by

_/s/ Peter Goselin_
Peter Goselin ct06074
The Law Office of Peter Goselin
P.O. Box 331313
Hartford, Connecticut 06133
Tel. 860-580-9675
Fax 860-232-7818
pdgoselin@gmail.com

## CERTIFICATION

I hereby certify that on July 7, 2022, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

    / s /   Peter Goselin